Slip Op. 17-156

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE STANLEY WORKS (LANGFANG) FASTENING SYSTEMS CO., LTD., and STANLEY BLACK & DECKER, INC., <br><br>      Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br>      Defendant. | Before: Gary S. Katzmann, Judge <br><br> Court No. 14-00112 |

## OPINION

[Commerce's Final Results are sustained and plaintiff's motion for judgment on the agency record is denied.]

Dated: November 27, 2017

Lawrence J. Bogard, Neville Peterson, LLP, of Washington, DC, argued for plaintiff. With him on the brief was Peter J. Bogard.

Stephen C. Tosini, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With him on the supplemental brief were Joyce R. Branda, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director and Carrie A. Dunsmore, Trial Attorney. Of counsel on the brief was Justin Becker, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce of Washington, DC. With them on defendant's notice of supplemental authority dated July 6, 2015, was Benjamin C. Mizer, Principal Deputy Assistant Attorney General, and of counsel on the notice was Michael T. Gagain, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce of Washington, DC. With them on defendant's notice of supplemental authority dated November 7, 2017, was Chad S. Readler, Acting Assistant Attorney General.

     Katzmann, Judge:  Differential pricing -- an analytical method used to identify the presence

of targeted dumping wherein a class or kind of foreign merchandise is being or is likely to be sold

in the United States at less than its fair value and prices differ significantly among producers,

regions, or time periods -- has been the subject of an evolving jurisprudence.  The case before the court provides an occasion to consider myriad issues arising from the deployment of the differential pricing methodology.  In the final results of the fourth antidumping duty administrative review of Certain Steel Nails from the People's Republic of China, the United States Department of Commerce International Trade Administration ("Commerce") found that respondents The Stanley Works (Langfang) Fastening Systems Co., Ltd. and Stanley Black & Decker, Inc. (collectively "Stanley") are subject to a weighted average antidumping duty margin of 3.92 percent.  79 Fed. Reg. 19,316, 19,316–18 (Dep't Commerce Apr. 8, 2014) (Final Results of the Fourth Antidumping Duty Administrative Review) ("Final Results") and accompanying Issues and Decision Memorandum ("IDM").   Stanley now asserts that the Final Results are neither in accordance with law nor supported by substantial evidence.  Pl.'s Mot. for J. on the Agency R., Sept. 16, 2014, ECF No. 23 ("Pl.'s Br.").  The Government opposes Stanley's motion.  ECF No. 30 ("Def.'s Br.").  The court concludes that:  (1) Commerce's use of differential pricing to identify the presence of targeted dumping is a reasonable interpretation of § 777A of the Tariff Act of 1930, codified at 19 U.S.C. § 1677f-1 (2012),[1] does not contravene congressional intent, and is lawful; (2) Stanley failed to exhaust its administrative remedies in arguing that Commerce applied its Meaningful Difference Test unreasonably; and (3) the Final Results do not contravene 19 C.F.R. § 351.414(f)(1)(i) and (f)(3) (2008).

**BACKGROUND**

I.      **Antidumping Investigations and Analytical Tools**

---

[1] Further citations to the Tariff Act of 1930 are to the relevant portions of Title 19 of the U.S. Code, 2012 edition, and all applicable amendments thereto.

In an antidumping investigation, Commerce determines whether a class or kind of foreign merchandise is being or is likely to be sold in the United States at less than its fair value, pursuant to 19 U.S.C. § 1673.  There are three methodologies that Commerce may use in an investigation to calculate dumping margins in accordance with the Tariff Act of 1930, as amended by the Uruguay Round Agreement Act ("URAA"), Pub L. No. 103-465, 108 Stat. 4809 (1994).  Mid Continent Nail Corp. v. United States, 846 F.3d 1364, 1369 (2017).  Commerce can compare the weighted average of the normal values[2] to the weighted average of the export prices[3] (or constructed export prices[4]) for comparable merchandise, per 19 U.S.C. § 1677f-1(d)(1)(A)(i), or

---

[2] Normal value is:

> the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price . . . .

19 U.S.C. § 1677b(a)(1)(B)(i).

[3] Export price is:

> the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted under subsection (c) of this section.

19 U.S.C. § 1677a(a).

[4]  Constructed export price is:

> the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted under subsections (c) and (d) of this section.

compare the normal values of individual transactions to the export prices (or constructed export prices) of individual transactions for comparable merchandise, per § 1677f-1(d)(1)(A)(ii).   19 U.S.C. § 1677f-1(d)(1).   These comparison methods are known, respectively, as the average-to average ("A-to-A") method and the transaction-to-transaction ("T-to-T") method.   When certain criteria are met, Commerce may apply a third, alternative comparison method, the average-to-transaction ("A-to-T") method, wherein it compares averaged values to the values of individual transactions.[5]   Commerce uses this A-T methodology to determine whether a respondent has engaged in "targeted dumping," that is, sales at less-than-fair-value made to certain purchasers, in certain regions, or during certain periods of times, despite complementary sales at fair value elsewhere.   See 19 U.S.C. § 1677f-1(d).   Commerce may utilize the A-T method so long as two conditions are met:

> (i)    there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and

---

19 U.S.C. § 1677a(b).

[5] 19 U.S.C. § 1677f-1(d)(1)(B) states:

> Exception.
> The administering authority may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if—
> (i) there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and
> (ii) the administering authority explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) or (ii).

> (ii)    [Commerce] explains why such differences cannot be taken
>          into account using a method described in paragraph (1)(A)(i)
>          [the A-A methodology] or (ii) [the T-T methodology].

19 U.S.C. § 1677f-1(d)(1)(B).

In contrast to the section of the statute covering investigations, the section which addresses administrative reviews -- 19 U.S.C. § 1677f-1(d)(2) -- contains no provision specifying the comparison method applicable to administrative reviews.[6]   Commerce has stated that it promulgated 19 C.F.R. § 351.414(b)[7] to fill this gap in the statute:

> 19 C.F.R. 351.414(b) describes the methods by which NV [Normal Value] may be compared to export price or constructed export price in less-than-fair-value investigations and administrative reviews (i.e., A to-A, T-to-T, and A-to-T). These comparison methods are distinct from each other. When using T-to-T or A-to-T comparisons,

---

[6]  19 U.S.C. § 1677f-1(d)(2) states:

> Reviews.
> In a review under section 1675 of this title, when comparing export prices (or constructed export prices) of individual transactions to the weighted average price of sales of the foreign like product, the administering authority shall limit its averaging of prices to a period not exceeding the calendar month that corresponds most closely to the calendar month of the individual export sale.

[7] 19 C.F.R. § 351.414(b) (2012) provides:

> (1) Average-to-average method. The "average-to-average" method involves a comparison of the weighted average of the normal values with the weighted average of the export prices (and constructed export prices) for comparable merchandise.

> (2)  Transaction-to-transaction method. The "transaction-to-transaction" method involves a comparison of the normal values of individual transactions with the export prices (or constructed export prices) of individual transactions for comparable merchandise.

> (3)  Average-to-transaction method. The "average-to-transaction" method involves a comparison of the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise.

a comparison is made for each export transaction to the United
States.  When using A-to-A comparisons, a comparison is made for
each group of comparable export transactions for which the export
prices, or constructed export prices, have been averaged together
(i.e., for an averaging group).  The Department does not interpret the
Act or the SAA [Statement of Administrative Action] to prohibit the
use of the A-to-A method in administrative reviews, nor does the
Act or the SAA mandate the use of the A-to-T method in
administrative reviews. 19 C.F.R. 351.414(c)(l) (2012) fills the gap
in the statute concerning the choice of a comparison method in the
context of administrative reviews.  In particular, the Department
determined that in both less-than-fair value investigations and
administrative reviews, the A-to-A method will be used "unless the
Secretary determines another method is appropriate in a particular
case" . . . . [Commerce also] look[s] to practices employed by the
Department in investigations for guidance on this issue.[8]

IDM at 19 (quoting 19 C.F.R. § 351.414(c)(l)); see Statement of Administrative Action,

accompanying the URAA, H.R. No. 103–316, vol. 1 (1994), reprinted in 1994 U.S.C.CAN.

4040 ("SAA").[9]

    To execute the statutory dictates of 19 U.S.C. § 1677f-1(d)(1)(B)(i), supra n.5, and to

determine specifically whether to apply an alternate comparison method, Commerce conducts an

analysis known as differential pricing.  Preliminary Decision Memorandum ("PDM") at 14, P.R.

258, accompanying Certain Steel Nails from the People's Republic of China:  Preliminary Results

---

[8] "In 2012, Commerce revised its methodology in administrative reviews from using average-to-
transaction comparisons as its general practice in administrative reviews to average-to-average
comparisons as the default method for calculating weighted average dumping margins." JBF RAK
LLC v. United States, 790 F.3d 1358, 1361 n.2 (Fed. Cir. 2015) (citing Union Steel v. United
States, 713 F.3d 1101, 1106 n.5 (Fed. Cir. 2013) (citing Antidumping Proceedings: Calculation of
the Weighted–Average Dumping Margin and Assessment Rate in Certain Antidumping Duty
Proceedings; Final Modification, 77 Fed. Reg. 8101 (Feb. 14, 2012)) (codified at 19 C.F.R. pt.
351)).

[9] The SAA "shall be regarded as an authoritative expression by the United States concerning the
interpretation and application of the Uruguay Round Agreements and this Act in any judicial
proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. §
3512(d).

of the Fourth Antidumping Duty Administrative Review, 78 Fed. Reg. 56,861 (Dep't Commerce

Sept. 16, 2013), P.R. 257.  The differential pricing analysis consists of three tests, segregated into

two stages.  See Apex Frozen Foods Private Ltd. v. United States, 862 F.3d 1337, 1342 n.2 (Fed.

Cir. 2017); PDM at 15.

     In the first stage, Commerce utilizes two tests to determine whether there exists a pattern

of prices that differ significantly, such that an alternative comparison method should be considered,

pursuant to 19 U.S.C. § 1677f-1(d)(1)(B)(i).  PDM at 15.  Commerce begins by applying the

Cohen's d test ("CDT"), which it characterizes as "a generally recognized statistical measure of

the extent of the difference between the mean of a test group and the mean of a comparison

group."[10]  Id.

> First, for comparable merchandise, the Cohen's d test is applied
> when the test and comparison groups of data each have at least two
> observations, and when the sales quantity for the comparison group
> accounts for at least five percent of the total sales quantity of the
> comparable merchandise.  Then, the Cohen's d coefficient is
> calculated to evaluate the extent to which the net prices to a
> particular purchaser, region or time period differ significantly from
> the net prices of all other sales of comparable merchandise.  The
> extent of these differences can be quantified by one of three fixed
> thresholds defined by the Cohen's d test: small, medium or large.
> Of these thresholds, the large threshold provides the strongest
> indication that there is a significant difference between the means of
> the test and comparison groups, while the small threshold provides
> the weakest indication that such a difference exists.  For this
> analysis, the difference was considered significant if the calculated
> Cohen's d coefficient is equal to or exceeds the large (i.e., 0.8)
> threshold.

_____

[10] Commerce's methodological implementation of 19 U.S.C. § 1677f-1(d)(1)(B) has evolved
over time.  In implementing the differential pricing analysis methodology, and displacing the
previously utilized "Nails Test," Commerce stated that it "has continued to seek to refine its
approach with respect to the use of an alternative comparison method. . . . The new approach is
referred to as the 'differential pricing' analysis . . . ."  Differential Pricing Analysis; Request for
Comments, 79 Fed. Reg. 26,720 (Dep't Commerce May 9, 2014).  Commerce concurrently
sought "public comment on the possible further development of its approach for use of an
alternative comparison method," including the use of the CDT.  Id. at 26,722.

PDM at 15.

Thus, the net price to a particular purchaser, region or time period "passes" the CDT if its

calculated Cohen's d coefficient is 0.8 or greater.  Commerce next applies the Ratio Test, wherein

it assesses the extent of the significant price differences for all sales as measured by the CDT:

> If the value of sales to purchasers, regions, and time periods that
> pass the Cohen's d test account for 66 percent or more of the value
> of total sales, then the identified pattern of prices that differ
> significantly supports the consideration of the application of the A-
> T method to all sales as an alternative to the A-A method. If the
> value of sales to purchasers, regions, and time periods that pass the
> Cohen's d test accounts for more than 33 percent and less than 66
> percent of the value of total sales, then the results support
> consideration of the application of an A-T method to those sales
> identified as passing the Cohen's d test as an alternative to the A-A
> method, and application of the A-A method to those sales identified
> as not passing the Cohen's d test. If 33 percent or less of the value
> of total sales passes the Cohen's d test, then the results of the
> Cohen's d test do not support consideration of an alternative to the
> A-A method.

Id.

If Commerce determines that both of these tests demonstrate the existence of a pattern of

prices that differ significantly enough to warrant consideration of an alternative comparison

method, then Commerce proceeds to the second stage of the differential pricing analysis, in which

it examines whether using only the A-A method can appropriately account for those differences,

pursuant to 19 U.S.C. § 1677f-1(d)(1)(B)(ii).  PDM at 15.  Commerce makes this determination

by applying the Meaningful Difference Test, a methodology which compares the dumping margin

that results from the applied CDT and ratio test, as described supra, with the dumping margin that

would result from the use of the A-A method only.  Id.  A difference in the weighted-average

dumping margins is considered meaningful if (1) there is a 25 percent relative change in the

weighted-average dumping margin between the A-A method and the appropriate alternative

method where both rates are above the de minimis threshold, or (2) the resulting weighted-average

dumping margin moves across the de minimis threshold.  Id. at 15–16.  If this determination is

affirmative, Commerce submits that its statutory mandate to "explain[] why such differences

cannot be taken into account using" the A-A or T-T methods, per 19 U.S.C. § 1677f-1(d)(1)(B)(i),

has been fulfilled.  Id. at 14.

## II.    Procedural History

Commerce issued an antidumping duty order covering certain steel nails from the People's

Republic of China in August 2008.  Antidumping Duty Order:  Certain Steel Nails from the

People's Republic of China, 73 Fed. Reg. 44,961 (Dep't Commerce Aug. 1, 2008).  Commerce

initiated the fourth Nails from China administrative review on September 26, 2012.  Initiation of

Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in

Part, 77 Fed. Reg. 59,168 (Dep't Commerce Sept. 26, 2012).  Commerce named Stanley a

mandatory respondent pursuant to 19 U.S.C. § 1677f-1(c)(2)[11] on November 20, 2012, and issued

an antidumping duty questionnaire on the following day.  See Memorandum Re: Fourth

---

[11] In antidumping duty investigations or administrative reviews, Commerce may select
mandatory respondents pursuant to 19 U.S.C. § 1677f-1(c)(2), which provides:

> If it is not practicable to make individual weighted average dumping
> margin determinations [in investigations or administrative reviews]
> because of the large number of exporters or producers involved in
> the investigation or review, the administering authority may
> determine the weighted average dumping margins for a reasonable
> number of exporters or producers by limiting its examination to--
>
> (A) a sample of exporters, producers, or types of products
> that is statistically valid based on the information available
> to the administering authority at the time of selection, or
> (B) exporters and producers accounting for the largest
> volume of the subject merchandise from the exporting
> country that can be reasonably examined.

Antidumping Duty Administrative Review of Certain Steel Nails from the People's Republic Selection of Respondents for Individual Review (Nov. 20, 2012), P.R. 62; Cover Letter enclosing the Antidumping Duty Questionnaire for the Fourth Administrative Review (Nov. 21, 2012), P.R. 65.

Commerce published notice of the preliminary results of the fourth administrative review on September 16, 2013.  78 Fed. Reg. 56,861.  Commerce found that the differential pricing analysis that it had used in recent investigations "may be instructive for purposes of examining whether to apply an alternative comparison method in this administrative review."  PDM at 14. Upon conducting the differential pricing analysis, Commerce found that between 33 and 66 percent of Stanley's United States sales confirm the existence of a pattern of constructed export prices for comparable merchandise that differ significantly among purchasers, regions, or time periods. Id. at 16.  Specifically, Commerce concluded that 64.7 percent of Stanley's sales "passed" the CDT, and thus displayed a pattern of significant price differences.  Id.; Memorandum to the File Re:   Preliminary Results Analysis for Stanley, September 3, 2013 at 14, P.R. 261 ("Preliminary Results Memo").   Commerce accordingly determined that there existed a meaningful difference in the results between the weighted-average dumping margin calculated using the standard A-A method for all U.S. sales and the margin calculated using the appropriate alternative comparison method.  PDM at 16.  Therefore, Commerce concluded, the A-A method could not take into account the observed differences, and the mixed alternative method was the appropriate means of calculating Stanley's weighted-average dumping margin.  Id.

Commerce preliminarily calculated a weighted-average dumping margin of 22.90 percent for Stanley using the mixed alternative comparison methodology, wherein Commerce applied the A-T methodology to those of Stanley's United States sales that "passed" the CDT, and the A-A

methodology to Stanley's other United States sales that did not.  78 Fed. Reg. at 56,862; <u>PDM</u> at 16; Preliminary Results Memo at 14.  On December 18, 2013, Stanley submitted its Case Brief to Commerce.  P.R. 303–05.

On April 8, 2012, Commerce published the <u>Final Results</u>.  79 Fed. Reg. 19,316.  Commerce continued to find it appropriate to use the mixed alternative methodology and apply the A-T comparison methodology to those of Stanley's United States sales that "passed" the CDT, while applying the A-A methodology to Stanley's other sales that did not.  <u>IDM</u> at 24.  Consequently, Commerce calculated a 3.92 percent weighted-average dumping margin for Stanley.  <u>Final Results</u> at 19,318.

Stanley filed this case to contest Commerce's <u>Final Results</u> on May 6, 2014.  Summons, ECF No. 1; Compl., May 13, 2014, ECF No. 8.  On September 16, 2014, Stanley submitted its Motion for Judgment on the Agency Record to the Court.  Pl.'s Br.  Specifically, Stanley asserts that the <u>Final Results</u> are neither in accordance with law nor supported by substantial evidence, because:  (1) the CDT is an unreasonable means of effecting a targeted dumping analysis under 19 U.S.C. § 1677f-1(d), for several reasons; (2) even if the CDT were a reasonable methodological choice, Commerce incorrectly applied it to Stanley's sales data; and (3) Commerce's application of the Meaningful Difference Test does not satisfy Commerce's requirements under the statute.  Stanley also argues that the <u>Final Results</u> contravene 19 C.F.R. § 351.414(f)(1)(i) and (f)(3) (2008).  On December 15, 2014, the Government filed its brief in opposition to Stanley's motion.  Def.'s Br.  Stanley filed its reply on February 2, 2015.  ECF No. 37 ("Pl.'s Reply").

On November 29, 2016, this court stayed this action pending resolution of <u>Mid Continent Nail Corp. v. United States</u>, CAFC Appeal No. 2016-1426 (Fed. Cir. filed Jan. 6, 2016). Order, Nov. 29, 2016, ECF No. 53.  In <u>Mid Continent</u>, the issue on appeal was whether Commerce

complied with notice-and-comment rulemaking under the Administrative Procedure Act ("APA"),

5 U.S.C. §§ 553(b), 551(5) (2006), by repealing a regulation restricting the agency's use of the A-

T methodology, 19 C.F.R. § 351.414(f)(2) (2008), known as the "Limiting Regulation," which

provided that even in cases meeting the statutory criteria for applying the A-T methodology, the

agency would "normally . . . limit [its] application . . . to those sales that constitute targeted

dumping." Mid Continent, 846 F.3d at 1370 (quoting 19 C.F.R. § 351.414(f)(2)); see Antidumping

Duties; Countervailing Duties, Final Rule, 62 Fed. Reg. 27,296, 27,375 (Dep't Commerce May

19, 1997).  On January 27, 2017, the Federal Circuit issued its Opinion in Mid Continent, in which

it held that Commerce failed to comply with notice-and-comment rulemaking under the APA by

repealing the Limiting Regulation in the Withdrawal of the Regulatory Provisions Governing

Targeted Dumping in Antidumping Duty Investigations, Interim Final Rule, 73 Fed. Reg. 74,931

(Dep't Commerce Dec. 10, 2008); that its failure could not be excused for good cause or harmless

error; and that the agency did not err in applying the Limiting Regulation on remand.  846 F.3d at

1386.  The Federal Circuit issued the Mandate in Mid Continent on March 20, 2017.

     After teleconference with the parties on April 19, 2017, this court stayed this action a

second time pending the resolution of Apex Frozen Foods Private Ltd. v. United States, CAFC

Appeal No. 2015-2085 (Fed. Cir. filed Sept. 29, 2015) and Apex Frozen Foods Private Ltd. v.

United States, CAFC Appeal No. 2016-1789 (Fed. Cir. filed Apr. 5, 2016).  Order, April 19, 2017,

ECF No. 58.  The issues in those cases, as relevant here, were whether the Limiting Regulation

applies to administrative reviews as well as investigations and whether Commerce's Meaningful

Difference Test was a reasonable exercise of Commerce's discretion.  On July 12, 2017, the

Federal Circuit issued its Opinions in Apex Frozen Foods Private Ltd. v. United States, 862 F.3d

1337 (Fed. Cir. 2017) ("Apex I") and Apex Frozen Foods Private Ltd. v. United States, 862 F.3d

1322 (Fed. Cir. 2017) ("Apex II").

On August 9, 2017, the court ordered parties to submit supplemental briefing addressing

the relevance of Mid Continent, Apex I, and Apex II to this proceeding.  ECF No. 61.  Stanley and

the Government submitted their supplemental briefs on September 12, 2017.  ECF No. 62; ECF

No. 63 ("Pl.'s Suppl. Br.").  The parties submitted their reply to each other's supplemental brief

on September 26, 2017.  ECF No. 64; ECF No. 65.  Oral argument was held before the court on

Tuesday, October 31, 2017.  ECF No. 68.  At the direction of the court, the parties submitted post-

argument briefing regarding the adoption of the CDT methodology.  ECF Nos. 69, 70.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) (2012) and 19

U.S.C. § 1516a(a)(2)(A)(i)(I) and (a)(2)(B)(iii).  The standard of review in this action is set forth

in 19 U.S.C. § 1516a(b)(l)(B)(i):  "[t]he court shall hold unlawful any determination, finding or

conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in

accordance with law."

## ANALYSIS

Stanley argues[12] (1) Commerce's use of differential pricing to identify the presence of

targeted dumping is an unreasonable interpretation of the statute and contravenes congressional

---

[12] Stanley initially argued that Commerce has no statutory authority to conduct a targeted dumping analysis in administrative reviews.  Pl.'s Br. at 15.  Stanley noted that 19 U.S.C. § 1677f-1(d)(1)(B) authorizes Commerce to deviate from A-A price comparisons, and resort to A-T price comparisons in antidumping duty investigations.  Id. at 16.  The provision governing administrative reviews, however, does not contain analogous language and thus, according to Stanley, in its initial briefing, does not confer similar authority.  Id. at 16–17 (citing Nken v. Holder, 129 S. Ct. 1749, 1759 (2009)); see GAF Italia S.p.A. v. United States, 291 F.3d 806, 816 (Fed. Cir. 2002) ("It is indeed well established that the absence of a statutory prohibition cannot be the source of agency authority.").  Stanley submitted that the Federal Circuit has found the absence of statutory authority

intent; (2) that Commerce applied its Meaningful Difference Test unreasonably; and (3) the Final

Results contravene 19 C.F.R. § 351.414(f)(1)(i) and (f)(3) (2008).   For the reasons set forth

hereafter, the court finds Stanley's arguments unavailing and denies its motion for judgment on

the agency record.

### A. Commerce reasonably applied the differential pricing analysis, the Cohen's d Test, and the Meaningful Difference Test in this proceeding.

As explained supra pp.6–9, Commerce's differential pricing analysis is broadly divisible

into three tests: (1) the CDT, (2) the Ratio Test and (3) the Meaningful Difference Test.   Stanley

argues that Commerce's analysis was deficient for a number of reasons.   Stanley also argues that

---

of greater import than policy arguments advanced by Commerce.  Pl.'s Br. at 18 (citing Ad Hoc Comm. of AZ-NM-TX-FL Producers of Gray Portland Cement v. United States, 13 F.3d 398, 403 (Fed. Cir. 1994) ("Even if the statute's 'primary goal' may seem to be ill-served . . ., that conclusion does not justify reading into the statute agency discretion that clearly is not there.")).

The arguments made by Stanley here regarding Commerce's authority to apply the A-T methodology in administrative reviews are effectively identical to those addressed and disposed of by the Federal Circuit in JBF RAK LLC v. United States, 790 F.3d 1358 (Fed. Cir. 2015), which was issued during the pendency of this action and conclusively stated that the A-T method is statutorily authorized.  The Federal Circuit stated that Commerce may perform its duties in the way it believes most suitable in the absence of any congressionally mandated procedure or methodology.  Id. at 1362.  "[I]f Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation.  Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."  Id. at 1364 (quoting Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U S. 837, 843–44 (1984)).  The Federal Circuit found that Commerce, in promulgating and applying the relevant regulation, 19 C.F.R. § 351.414(b)(1)–(3), (c)(1), "exercised its gap-filling discretion by applying a comparison methodology[, i.e. the average-to-transaction, A-T, comparison method,] in reviews that parallels the methodology used in investigations."  Id.  (quoting JBF RAK LLC v. United States, 38 CIT ___, ___, 991 F. Supp. 2d 1343, 1347).  Accordingly, "Commerce's decision to apply its average-to-transaction comparison methodology in the context of an administrative review is reasonable.  Because Congress did not provide for a direct methodology, Commerce properly 'fill[ed] th[at] gap.'"  Id. (quoting Chevron, 467 U.S. at 843).

Following JBF RAK, the court thus holds, and the parties agreed at oral argument, that Commerce's application of the A-T methodology in the instant administrative review, as embodied in the Final Results, was reasonable and in accordance with law.

the differential pricing methodology altogether runs counter to Congressional intent and is thus

unreasonable.

### 1. Commerce reasonably applied the Cohen's d Test.

Stanley asserts first that the CDT is designed to assess a different type of data.  Pl.'s Br. at

25.   Specifically, Stanley submits that Dr. Cohen, the creator of the CDT, suggests that mean

differences rather than standardized mean differences (d values) should be used in measuring effect

sizes when comparing groups on a variable measured in units that are well understood:

> [when] comparing groups on a variable measured in units that are
> well understood by your readers (IQ points, or <u>dollars</u>, or number of
> children, or months of survival) mean differences are excellent
> measures of effect sizes.  When this isn't the case . . . the results can
> be translated into standardized mean differences (d values) or some
> measure of correlation or association.

Pl.'s Br. at 25 (emphasis added) (citing Jacob Cohen, "Things I Have Learned (So Far)," <u>American</u>

<u>Psychologist</u>, v. 45, no. 12 December 1990, 1304–12).   Stanley argues that, consistent with this

observation, the Cohen's d statistic is not a tool used in business, finance, or other contexts in

which a variable, such as dollars, can be easily quantified.  Pl.'s Br. at 26.  Stanley thus disputes

Commerce's characterization of its antidumping analysis as a social science that analyzes a

respondent's "pricing behavior," <u>IDM</u> at 26, and argues that Commerce failed to recognize that

the selfsame pricing behavior is measured in easily understood units:  dollars.  Pl.'s Br. at 26.

Second, Stanley argues that the term "significantly," found in 19 U.S.C. § 1677f-

1(d)(1)(B)(i) and in the <u>SAA</u> at 843, should be read to mean "statistical significance."  Pl.'s Br. at

27.  Stanley thus argues that Commerce, by interpreting "significant" more generally to mean

"large," did not meet its statutory obligation to determine whether "there is a pattern of export

prices (or constructed export prices) for comparable merchandise that differ significantly among

purchasers, regions, or periods of time." 19 U.S.C. § 1677f-1; see IDM at 28 ("The statute does not require that the difference be 'statistically significant' only that it be significant.").

Third, Stanley argues that the Cohen's d statistic is an estimation tool, suited for making reasonable queries as to the size of a value given only a sample of data. Pl.'s Br. at 29–30. Rather, where the entire data population is known, as here, statistical inference tools, among which the Cohen's d statistic is not, are appropriate. Id. (citing Kohler, Heinz, Statistics for Business and Economics, 3rd Ed., Harper Collins (1994), at 293 ("The process of inferring the values of unknown population parameters from those known sample statistics is called estimation . . . .")). Further, Stanley argues that the Cohen's d statistic is unreasonably applied where no hypothesis is being tested. Id. at 31–32.

Fourth, Stanley argues that Commerce's classification of effect sizes as "small," "medium," and "large," is not a widely accepted division, as Commerce claims, IDM at 26–27, and is instead a selection of arbitrary thresholds. Pl.'s Br. at 33 (citing Cohen, Jacob, Statistical Power for the Behavioral Sciences, 2nd Ed., Lawrence Erlbaum Associates (1988), at 484). Per Stanley, Commerce failed to explain how these thresholds are relevant to the underlying proceeding and thus rendered the Final Results arbitrary.

Stanley next argues that Commerce has failed to explain how its stratification of sales that "pass" the CDT into three tiers based on the ratio of the value of "passed" sales to total sales value -- those (1) below 33 percent; (2) between 33 and 66 percent; and (3) above 66 percent -- identifies a "pattern" of significant price differences pursuant to 19 U.S.C. § 1677f-1(d)(1)(B)(i). Pl.'s Br. at 38. Stanley considers the segregation of "pass" rates into these thresholds to be arbitrary, and argues that the Final Results do not justify the selection of those numerical thresholds or explain

how they reveal a pattern of United States prices that differ significantly among purchasers, regions, or periods of time.  Pl.'s Br. at 38–39.

At the outset, the court notes that the question of the reasonableness of the utilization of the CDT has not been determined by the Federal Circuit.  While the Federal Circuit in <u>Apex I</u> affirmed an opinion of this court holding that the CDT was a permissible exercise of Commerce's discretion under the statute, and thus a reasonable methodological choice in accordance with law, <u>see</u> <u>Apex Frozen Foods Private Ltd. v. United States</u>, 40 CIT ___, ___, 144 F. Supp. 3d 1308, 1323–29 (2016), <u>aff'd</u>, 862 F.3d 1337 (Fed. Cir. 2017), the Federal Circuit did not have occasion to directly address whether Commerce's use of CDT was reasonable and in accordance with law. <u>See</u> <u>Apex I</u>, 862 F.3d at 1344 ("Apex does not challenge the results of Commerce's application of the Cohen's d test . . . .") and <u>id.</u> at 1342 n.2 ("A high-level summary of the differential pricing analysis is sufficient for our purposes, as the parties do not dispute the use and results on appeal.").[13]

When determining whether Commerce's interpretation and application of the statute is in accordance with law, this Court must consider "whether Congress has directly spoken to the precise question at issue," and, if not, whether the agency's interpretation of the statute is reasonable.  <u>Apex I</u>, 862 F.3d at 1344 (quoting <u>Chevron U.S.A, Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U S. 837, 842–43 (1984)). If the Court determines that the statute is silent or ambiguous with respect to the specific issue, then the traditional second prong of the <u>Chevron</u> analysis asks what level of deference is owed Commerce's interpretation.  <u>Chevron</u>, 467 U.S. at 842–43; <u>see</u> <u>United States v. Mead Corp.</u>, 533 U.S. 218, 228 (2001).  "<u>Chevron</u> requires us to defer to the

---

[13] The reasonableness of the CDT has been considered in two opinions of this Court.  <u>See</u> <u>Xi'an Metals & Minerals Imp. & Exp. Co. v. United States</u>, 41 CIT ___, Slip Op. 17-120 (Sep. 6, 2017); <u>Tri Union Frozen Prod., Inc. v. United States</u>, 40 CIT ___, 163 F. Supp. 3d 1255 (2016).

agency's interpretation of its own statute as long as that interpretation is reasonable." Koyo Seiko Co., Ltd, v. United States, 36 F.3d 1565, 1573 (Fed. Cir. 1994); see Kyocera Solar, Inc. v. United States Int'l Trade Comm'n, 844 F.3d 1334 (Fed. Cir. 2016).

The statute does not mandate how Commerce is to conduct its targeted dumping analysis. See 19 U.S.C. § 1677f-1. Thus the agency's discretionary choice to employ a particular methodology, here the CDT, is entitled to deference from this court, so long as that methodological choice is reasonable. See JBF RAK, 790 F.3d at 1362; Chevron, 467 U.S. at 842–43. The court emphasizes that "[a]ntidumping . . . duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts." PSC VSMPO-Avisma Corp. v. United States, 688 F.3d 751, 764 (Fed. Cir. 2012), cited in Apex I, 862 F.3d at 1347. The court thus affords Commerce significant deference in those determinations. See id.; Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1039 (Fed. Cir. 1996). Despite this wide discretion, Commerce "must cogently explain why it has exercised its discretion in a given manner." Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 48 (1983). The court therefore asks whether Commerce has adequately explained its methodological choice, and more generally, whether that choice is reasonable. See CS Wind Vietnam Co. v. United States, 832 F.3d 1367, 1377 (Fed. Cir. 2016) ("The requirement of explanation presumes the expertise and experience of the agency and still demands an adequate explanation in the particular matter." (citing Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167–68 (1962))).

The court finds that Commerce's application of the CDT here constitutes a reasonable exercise of its discretion under the statute, and that as to each of Stanley's arguments, Commerce adequately explained on the record the choices it made in employing that methodology. The court

is not persuaded by Stanley's arguments that the CDT is inapposite to the pricing behavior under

Commerce's consideration, or by Stanley's characterization of the CDT as "an estimation tool"

that renders the methodology inappropriate when all data points are known to Commerce.

Stanley's academic citations, Pl.'s Br. at 25–26, do not preclude the possibility that the CDT could

be deployed in a pricing analysis where all of the prices are known to Commerce, even if,

arguendo, another methodology were more suited to determining the presence of significant

differences in price among purchasers, regions, or periods of time.   "[W]e cannot say that the

methodology Commerce has chosen to implement Congress's statutory scheme is unreasonable,

even where its justification may be . . . less than ideal."  Apex I, 862 F.3d at 1347 (citation omitted);

see JBF RAK, 790 F.3d at 1364 ("Because Congress did not provide for a direct methodology,

Commerce properly 'fill[ed] th[at] gap.'" (quoting Chevron, 467 U.S. at 843)).

Commerce explained in the IDM its justifications for utilizing the CDT, stressing its focus

on the value of effect sizes in quantifying the differences between data points.  IDM at 25 & n.110

(quoting Xanthan Gum From the People's Republic of China: Final Determination of Sales at Less

Than Fair Value, 78 Fed. Reg. 33,351 (Dep't Commerce June 4, 2013) ("Xanthan Gum") and

accompanying IDM at 24 (quoting Coe, Robert, "It's the Effect Size, Stupid: What effect size is

and why it is important," paper presented at the Annual Conference of British Educational

Research Association (September 12–14, 2002))).  Similarly, Commerce adequately explained that

the CDT may be reasonably employed to measure pricing behavior, an element of economic

analysis that may not be quantified in easily understood variables in the manner of a strictly "hard"

science.  IDM at 25–26.

The court is likewise unpersuaded by Stanley's argument that Commerce's designated

effect sizes -- "small," "medium," and "large" -- are arbitrary such that the CDT methodology and

the <u>Final Results</u> are arbitrary and not in accordance with law.  While Stanley may dispute the

ubiquity of effect size divisions into those three thresholds, the court does not see that Commerce

applies the thresholds it has chosen in an arbitrary manner.  <u>IDM</u> at 26–27.  Commerce explained

its decision to consider the large threshold, a 0.8 Cohen's d coefficient, to be the baseline measure

of a significant difference in prices.  <u>Id.</u> at 27 (citing <u>PDM</u> at 15).  While Commerce may not have

"explain[ed] how these thresholds relate to selling nails," Pl.'s Br. at 34, per se, it did explain the

relevance of the thresholds in the overall application of the CDT and its differential pricing

analysis.  <u>PDM</u> at 14–15.  Commerce responded to Stanley's concerns, and cited an academic

article in support of its deployment of the relevant thresholds.  <u>IDM</u> at 26–27 (quoting <u>Xanthan</u>

<u>Gum</u> IDM at 24 (quoting Coe, <u>supra</u> p.19)).  Commerce noted that it restricts CDT "passage" to

those coefficient results that meet or exceed the "large" threshold of 0.8.  <u>Id.</u> at 27.  Commerce

thus explained its methodological choices and reasonably supplied justifications for them.  <u>See</u>

<u>State Farm</u>, 463 U.S. at 48–49.  Even assuming arguendo that Commerce's justification for

utilizing these thresholds is not optimal or consonant with some universal standard, the "court is

not to substitute its judgment for that of the agency, and should uphold a decision of less than ideal

clarity if the agency's path may reasonably be discerned."  <u>FCC v. Fox Television Stations, Inc.</u>,

556 U.S. 502, 513–14 (2009), <u>cited in</u> <u>Apex I</u>, 862 F.3d at 1347.  Commerce's application of the

thresholds therefore was not arbitrary.  <u>See</u> <u>Changzhou Wujin Fine Chem. Factory Co. v. United</u>

<u>States</u>, 701 F.3d 1367, 1377 (Fed. Cir. 2012) ("[H]ere we are evaluating the agency's reasoning,

which is reviewed under the arbitrary and capricious (or contrary to law) standard.").

     The court turns to Stanley's argument that the CDT does not measure "statistical

significance" and thus is an unreasonable execution of the statute.  Stanley's reading of 19 U.S.C.

§ 1677f-1 and the <u>SAA</u> is unpersuasive.  The plain text of the statute commands only that

Commerce, in applying an alternative methodology, must determine the presence of "a pattern of export prices (or constructed export prices) for comparable merchandise that <u>differ significantly</u> among purchasers, regions, or periods of time . . . ." 19 U.S.C. § 1677f-1(d)(1)(B)(i) (emphasis added). Meanwhile, the <u>SAA</u> explains that the alternative comparison method is appropriate where the A-A or T-T methods "cannot account for a pattern of prices that <u>differ significantly</u> among purchasers, regions, or time periods, i.e., where targeted dumping may be occurring." <u>SAA</u> at 843 (emphasis added). Stanley's argument that the phrase "differ significantly" necessarily invokes a difference of "statistical significance," as opposed to mere "significance," has no basis in the statutory language, and Stanley is unable to proffer authority which requires Commerce or this court to read "significantly" as referring to a more commanding standard. Commerce is entitled to interpret the statutory language, and the court must defer to that interpretation, so long as it is reasonable. <u>Chevron</u>, 467 U.S. at 842; <u>Koyo Seiko</u>, 36 F.3d at 1573.

Here, Commerce has deployed the CDT and the Meaningful Difference Test, <u>supra</u> pp.6–9, to assess the presence and significance of differences of United States sales prices among purchasers, regions, or periods of time. Commerce reasonably explained that it found no cause to read the statute as requiring an assessment of "statistical significance." <u>IDM</u> at 28. As explained <u>supra</u>, the statute demands the application of no particular methodology. "When a statute fails to make clear 'any Congressionally mandated procedure or methodology for assessment of the statutory tests,' Commerce 'may perform its duties in the way it believes most suitable.'" <u>Apex I</u>, 862 F.3d at 1349 (quoting <u>JBF RAK</u>, 790 F.3d at 1363). Here, Commerce reasonably exercised its discretion under the statute by deploying the CDT. Further, Commerce directly answered Stanley's argument that "statistical significance" is the applicable statutory standard:

> Statistical significance is used to evaluate whether the results of an analysis rise above sampling error (i.e., noise) present in the analysis.

> The Department's application of the Cohen's d test is based on the
> mean and variance calculated using the entire population of the
> respondent's sales in the U.S. market, and, therefore, these values
> contain no sampling error.  Accordingly, statistical significance is
> not a relevant consideration in this context.

IDM at 29.  The agency thus did explain its decision to deploy its chosen thresholds such that its

application of them is not arbitrary.  Even assuming Stanley's proffered methodology, which would

involve some stricter "statistical significance" standard, constituted a plausible interpretation of the

statute, "it does not necessarily follow that Commerce's different interpretation would be

unreasonable or impermissible."  Apex I, 862 F.3d at 1347 (citing Chevron, 467 U.S. at 843 n.11

("The court need not conclude that the agency construction was the only one it permissibly could

have adopted to uphold the construction . . . .")).

        Having found the CDT to be a reasonable methodology in exercise of Commerce's statutory

discretion, the court similarly finds that Commerce did not apply the CDT to Stanley's data in an

unreasonable fashion.  The court is not persuaded by Stanley's submitted data, attached to its brief

as Addendum A.  See Pl.'s Br. at Add. A.  Stanley states that, of 111 respondents described in its

addendum,  while 27 respondents either had no sales that "passed" the CDT or had "pass" rates

below the 33 percent threshold, "the average CDT 'pass' rate for the remaining 84 respondents was

67.99 percent . . . . In other words, in preliminary decisions Commerce has concluded that 75 percent

of the respondents investigated each targeted more than two-thirds of their sales . . . It is

unreasonable to the point of preposterous to conclude that 75 percent of investigated companies do

so."  Pl.'s Br. at 40 (emphasis added).

        This assertion is not correct.  By Stanley's own reading of a CDT "pass" rate corresponding

directly to targeting, the data in Addendum A shows that 46 respondents, and not more than 75

percent, of the 111 listed respondents "each targeted more than two-thirds [i.e., met or exceeded the

66 percent CDT "pass" rate threshold] of their sales." Pl.'s Br. at Add. A. More pertinently,

Commerce applied the A-T alternative comparison method in only 18 of those instances. Id.

Stanley's arguments that the CDT produces biased results are therefore unpersuasive.[14]

> **2. Stanley's arguments regarding differential pricing, the Meaningful Difference Test, and congressional intent are unpersuasive.**
>
> > **a. Stanley failed to exhaust its administrative remedies regarding the Meaningful Difference Test.**

Stanley argues that differential pricing cannot explain, as required by 19 U.S.C. § 1677f-

1(d)(1)(B)(ii), "why such differences" in United States sales prices among purchasers, regions, or

periods of time, "cannot be taken into account using" the A-A or T-T methods. Pl.'s Br. at 35. In

essence, Stanley argues that Commerce's Meaningful Difference Test, wherein it compares a

respondent's dumping margin that results from the applied CDT and Ratio Test with the dumping

margin that would result from the use of the A-A method only, does not explain, as required by

the statute, why the routine methodologies are insufficient to account for those differences. Id. at

35–36. Stanley cites to Beijing Tianhai for the proposition that Commerce's "purported

explanation" as to why the pattern of price differences at issue in the underlying proceeding could

not be taken into account using the standard A-A methodology "says nothing more than that

Commerce found a pattern of differing prices and invoked the mathematical truism that when you

average a set of numbers, the differences among the numbers cease to be apparent." Pl.'s Br. at

35 (quoting Beijing Tianhai Indus. Co. v. United States, 38 CIT ___, ___, 7 F. Supp. 3d 1318,

1331 (2014)). Stanley offers the point made in that case that Commerce "supplied a conclusion,

---

[14] Stanley's remaining arguments, see Pl.'s Br. at 44–49, effectively request that the court manage Commerce's application of the CDT, even if, as the court has found here, the CDT is a reasonable methodology performed in exercise of Commerce's discretion under the statute. See supra pp. 18–23; 19 U.S.C. § 1677f-1(d)(1). The court declines that invitation, for the reasons stated supra.

but not an explanation" and argues that the same is true here. Id. at 36 (quoting Beijing Tianhai, 7 F. Supp. 3d at 1332). Stanley also asserts that Commerce performed its A-A to A-T comparison (the heart of the Meaningful Difference Test) on the basis of Stanley's total sales, while it performed the CDT by looking at sales of individual products as denominated by product control numbers (i.e., CONNUMs); thus the A-A to A-T comparison "was unreasonably divorced from the specific price differences that are found to exist under the CDT and failed to explain why the A-A method could not account for observed price differences." Pl.'s Br. at 36.

Citing 28 U.S.C. § 2637(d) (2012), the Government contends that Stanley failed to argue before Commerce that the agency unreasonably performed its A-A to A-T comparison on the basis of Stanley's total sales, yet performed the CDT by looking at sales of individual products (i.e., CONNUMs). Def.'s Br. at 23–24 (citing 19 C.F.R. § 351.309(c)(2)); see 28 U.S.C. § 2637(d) ("In any civil action not specified in this section, the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies."). Because the statute does not address the issue, the Government argues, Commerce should have the first opportunity to address the argument under Chevron. Id. at 24. The Government asserts that none of the exceptions to the exhaustion requirement apply here. Id. at 25.

The court agrees that Stanley has failed to exhaust its administrative remedies. This Court "shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). "The doctrine of exhaustion provides 'that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.'" Essar Steel, Ltd. v. United States, 753 F.3d 1368, 1374 (Fed. Cir. 2014) (quoting Sandvik Steel Co. v. United States, 164 F.3d 596, 599 (Fed. Cir. 1998)). "Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should

not topple over administrative decisions unless the administrative body not only has erred but has

erred against objection made at the time appropriate under its practice." Mittal Steel Point Lisas

Ltd. v. United States, 548 F.3d 1375, 1383–84 (Fed. Cir. 2008) (quoting United States v. L.A.

Tucker Truck Lines, Inc., 344 U.S. 33, 37 (1952)).

Here, Stanley did not raise any arguments regarding the Meaningful Difference Test

element of the differential pricing analysis in its case brief before Commerce. See Stanley's Case

Brief. Exhaustion serves two main purposes: "to allow an administrative agency to perform

functions within its special competence — to make a factual record, to apply its expertise, and to

correct its own errors," and to "promot[e] judicial efficiency by enabling an agency to correct its

own errors so as to moot judicial controversies." Sandvik Steel, 164 F.3d at 600. The issue here -

- the appropriateness of the Meaningful Difference Test -- implicates both of these concerns; had

Stanley raised this argument regarding the Meaningful Difference Test during the administrative

proceedings, Commerce would have had the opportunity to better develop the record and apply its

expertise to assess its use of the Meaningful Difference Test.

Stanley's contention that "[i]n this case, Stanley clearly challenged the differential pricing

approach at the administrative level" does not excuse its failure to exhaust administrative remedies.

Pl.'s Reply at 19. Broad, generalized challenges to the differential pricing analysis do not

incorporate any conceivable challenge to elements of that analysis, such as to specific applications

of the Meaningful Difference Test. See Apex II, 862 F.3d at 1331–34 (affirming this court's

refusal to consider plaintiff's unexhausted argument -- that the Meaningful Difference Test's

analysis of all a respondent's sales does not speak to whether the A-A method can account for

targeting specifically -- where plaintiff had only previously criticized the Meaningful Difference

Test for its disparate use of zeroing in comparing A-A and A-T rates).

Further, Stanley has provided neither sufficient justification for its failure to raise its arguments regarding the Meaningful Difference Test in its case brief before Commerce nor convincing reasons why any of the exceptions to administrative exhaustion apply.   Stanley's argument that <u>Beijing Tianhai</u> constitutes an intervening judicial decision exception to the requirement of administrative exhaustion is not persuasive.   As an initial matter, <u>Beijing Tianhai</u> is not controlling on this court's disposition of the issue at hand.   More importantly, Stanley's precise arguments regarding the Meaningful Difference Test -- specifically, that Commerce unreasonably performed that test on Stanley's total sales while applying the CDT to individual CONNUMs -- are not implicated by <u>Beijing Tianhai</u> or Stanley's citation to it.   Stanley characterizes its argument as an "expan[sion] on the <u>Beijing Tianhai</u> court's conclusion that the 'meaningful difference' element did not meet its statutory obligation to explain why the A-A comparison could not account for observed price differences."   Pl.'s Reply at 18.   But that proffered application is too broad; Stanley effectively attempts to circumvent the administrative exhaustion requirement through reference to a non-controlling opinion holding a separate aspect of the Meaningful Difference Test inadequate.   <u>Compare</u> <u>Apex II</u>, 862 F.3d at 1331–34.   In summary, Stanley could have raised its argument before Commerce prior to the issuance of the <u>Beijing Tianhai</u> opinion.

Stanley also suggested at Oral Argument that the pure question of law exception to administrative exhaustion applies here, contending that whether the meaningful difference test fulfills the requirements of 19 U.S.C. § 1677f-1 is an issue of statutory construction.   However, "[s]tatutory construction alone is not sufficient to resolve this case." <u>Consol. Bearings Co. v. United States</u>, 348 F.3d 997, 1003 (Fed. Cir. 2003).   Rather, the question is whether the methodology is justifiable, and to resolve that issue, a factual record needs to be developed.   <u>See</u>

id. (determining that the pure legal question exception could not apply when the court would have to assess Commerce's justifications for its practice); Mittal Steel Point Lisas, 548 F.3d at 1384 (finding the pure question of law exception not applicable when argument relies on unique facts of the case); Fuwei Films (Shandong) Co. v. United States, 35 CIT ___, ___, 791 F. Supp. 2d 1381, 1384–85 (2011) (concluding that the pure legal question exception could not apply when the statute at issue did not speak to the required methodology and Commerce's interpretation was needed to fill the statutory gap).

"[A] litigant must diligently protect its rights in order to be entitled to relief."  JBF RAK, 790 F.3d at 1367 (quoting Mukand Int'l, Ltd. v. United States, 502 F.3d 1366, 1370 (Fed. Cir. 2007)).   Because Stanley did not raise this issue during the administrative proceedings and provides no sufficient reason for its failure to do so, the court declines to consider the merits of Stanley's total versus individual comparison argument.

### b.   Legislative history does not support Stanley's arguments.

Stanley argues that Commerce's application of the CDT runs counter to Congressional intent as expressed in the SAA.   Pl.'s Br. at 40–41.   Specifically, Stanley argues that the SAA instructs that the A-T methodology is to be applied "where targeted dumping may be occurring." Pl.'s Br. at 41 (quoting SAA at 843).   To Stanley, this means that the A-T methodology should be applied only where United States sales are less than fair value; by contrast, Stanley contends, Commerce focuses only on significant price differences, regardless of whether those differences result from sales being higher or lower than fair value.   Pl.'s Br. at 41 (quoting IDM at 30 ("The statutory language references prices that 'differ' and does not specify whether the prices differ by being lower or higher than the comparison sales. . . . [Commerce] explained that higher priced sales and lower priced sales do not operate independently; all sales are relevant to the analysis.")).

Thus, Stanley argues, the <u>Final Results</u> do not distinguish between sales that "pass" the CDT because the weighted-average prices of the test groups are <u>higher</u> than the weighted-average price of the comparison group, and sales that "pass" because the weighted-average prices of the test groups are <u>lower</u> than the weighted-averages of the comparison group prices.  Pl.'s Br. at 41–42. This, Stanley claims, runs counter to "the SAA's clear expression of congressional intent."  <u>Id.</u> at 42.

Stanley also points to the <u>SAA</u>'s statement that "in determining whether a pattern of significant price difference exists, Commerce will proceed on a case-by-case basis because small differences may be significant for one industry or one type of product but not for another."  Pl.'s Br. at 44 (quoting <u>SAA</u> at 843).  Stanley argues that Commerce has contravened this admonition by self-initiating targeted dumping analyses and applying differential pricing according to the same formula in every proceeding since <u>Xanthan Gum</u>.  Pl.'s Br. at 44.

Stanley's arguments do not persuade the court that the differential pricing analysis runs counter to congressional intent.  The statute provides only that Commerce must determine whether a pattern of prices that "differ significantly among purchasers, regions, or periods of time" exists, and does not specify whether Commerce may not consider prices that differ because they are higher or lower.  19 U.S.C. § 1677f-1(d)(1)(B).  The court is not persuaded that Stanley's reading of the <u>SAA</u> takes priority over Commerce's chosen methodology.  As an initial matter, the court does not find that the <u>SAA</u>'s reference to "situations . . . where targeted dumping may be occurring" necessarily confines any methodology implementing 19 U.S.C. § 1677f-1(d)(1)(B) to an analysis of sales at less-than-fair-value.  Pl.'s Br. at 41 (quoting <u>SAA</u> at 843).  Stanley's interpretation is not found in the plain text of § 1677f-1(d)(1)(B) and the <u>SAA</u>.  More generally, as explored <u>supra</u> regarding the deference owed Commerce's interpretation of the phrase "differ

significantly," Commerce is entitled to fill the statutory gap with a reasonable methodology and accompanying explanation.  Apex II, 862 F.3d at 1330 (citing Chevron, 467 U.S. at 843–44).  Here, Commerce explained in the IDM, inter alia, that "[b]y considering all sales, higher priced sales and lower priced sales, [Commerce] is able to analyze an exporter's pricing practice and to identify whether there is a pattern of prices that differ significantly."  IDM at 30.  Further, Commerce explained on the record that "higher priced sales are equally capable as lower priced sales to create a pattern of prices that differ significantly," and that high priced sales offset lower priced sales and thus "can mask dumping."  Id.  The court is satisfied that Commerce's methodology and explanation thereof are reasonable and in accordance with the statute, particularly where Stanley cannot identify statutory language commanding Commerce to conform to a stricter methodology than allowed by 19 U.S.C. § 1677f-1(d)(1)(B)(i).

The court also is not persuaded that Commerce has acted contrarily to congressional intent by applying differential pricing in a rote manner.  Pl.'s Br. at 44.  The court understands Commerce to require that a respondent's United States sales sequentially satisfy each of multiple tests in the differential pricing analysis before determining that the application of the alternate A-T methodology is appropriate.  Further, Commerce stated that it reviews comments from interested parties regarding its approach.  IDM at 31–32; PDM at 16.  Indeed, Commerce's responses to Stanley's comments throughout the IDM, though contrary to Stanley's positions, undermine the argument that Commerce here applied its methodology in a rote manner.  See generally IDM at 23–32.  The court therefore cannot say that Commerce has acted in contravention of legislative intent, nor discordantly with law, in its application of the differential pricing analysis to Stanley in the underlying proceeding.

**B.  19 C.F.R. § 351.414(f)(1), (3) do not apply to this proceeding under Mid Continent, and Apex II.**

Stanley argues that the Final Results violate 19 C.F.R. § 351.414(f) (2008),[15] which the Federal

Circuit held in Mid Continent remained in force during the relevant Period of Review in this case.

Pl.'s Br. at 22; see generally Mid Continent, 846 F.3d 1364.   The regulation, 19 C.F.R. §

351.414(f), provides, in relevant part:

> (f) Targeted dumping--
>> (1) In general. Notwithstanding paragraph (c)(1) of this section
>> [Commerce] may apply the average-to-transaction method, as
>> described in paragraph (e) of this section, in an antidumping
>> investigation if:
>>> (i) As determined through the use of, among other things,
>>> standard and appropriate statistical techniques, there is
>>> targeted dumping in the form of a pattern of export prices (or
>>> constructed export prices) for comparable merchandise that
>>> differ significantly among purchasers, regions, or periods of
>>> time; and
>>> (ii) [Commerce] determines that such differences cannot be
>>> taken into account using the average-to-average method or
>>> the transaction-to-transaction method and explains the basis
>>> for that determination.
>> (2) Limitation of average-to-transaction method to targeted
>> dumping. Where the criteria for identifying targeted dumping under
>> paragraph (f)(1) of this section are satisfied, [Commerce] normally
>> will limit the application of the average-to-transaction method to
>> those sales that constitute targeted dumping under paragraph
>> (f)(1)(i) of this section.
>> (3) Allegations concerning targeted dumping. [Commerce]
>> normally will examine only targeted dumping described in an
>> allegation, filed within the time indicated in § 351.301(d)(5).
>> Allegations must include all supporting factual information, and an
>> explanation as to why the average-to-average or transaction-to-
>> transaction method could not take into account any alleged price
>> differences.

Specifically, Stanley argues that Commerce initiated a differential pricing analysis without

an allegation of targeted dumping, in contravention of § 351.414(f)(3).   Pl.'s Br. at 22.   Stanley,

---

[15] All references to 19 C.F.R. § 351.414(f) are to the 2008 version, which the Federal Circuit
determined in Mid Continent, 846 F.3d 1364, was not validly repealed that year.

asserting that the CDT is an inapt statistical method, also argues that the <u>Final Results</u> violate the requirement of (f)(1)(i) that Commerce "use . . . standard and appropriate statistical techniques in determining whether there is a pattern of prices that differ significantly."  Pl.'s Br. at 23.

**1.  Stanley possesses standing to challenge Commerce's non-application of the regulatory provisions.**

The Government argues that Stanley lacks standing to challenge Commerce's interpretation of 19 C.F.R. § 351.414(f) because it has not averred any concrete and particularized injury in fact fairly traceable to the challenged action.  Def.'s Br. at 24 (quoting <u>Mendoza v. Perez</u>, 754 F.3d 1002, 1010 (D.C. Cir. 2014) (quoting <u>Lexmark Int'l, Inc. v. Static Control Components, Inc.</u>, 134 S.Ct. 1377, 1386 (2014))).  The Government also argues that the regulation applies only to investigations, and not to administrative reviews; therefore Stanley cannot trace its alleged injury to that regulation's non-application.  <u>Id.</u> at 34–35.

The court is not persuaded by the Government's standing argument, which presumes that its contention, now before the court, that the regulation does not apply to administrative reviews should prevail.   The applicability of certain subsections of § 351.414(f) to the underlying administrative reviews constitutes a live issue before the court.

> When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred . . . in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue.  If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.

<u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561–62 (1992).  Further, when challenging an action allegedly taken without required procedural safeguards, the plaintiff need not "establish that correcting the procedural violation would necessarily alter the final effect of the agency's action on the plaintiffs' interest."  <u>Mendoza</u>, 754 F.3d at 1010 (citing <u>Ctr. for Law & Educ. v. Dep't of</u>

Educ., 396 F.3d 1152, 1160 (D.C. Cir. 2005)).  Here, as has been noted, supra p.9 and n.11, Stanley

was a mandatory respondent in the challenged review, and thus possesses a legally protected

interest in a lawful calculation of its dumping margin.  Stanley's preferred interpretation of the

relevant regulatory provisions -- essentially, that they should apply to administrative reviews as

well as investigations -- would redress the alleged harm caused by their non-application to the

underlying proceeding.  Stanley thus possesses standing to challenge Commerce's interpretation

of 19 C.F.R. § 351.414(f).

> **2.  The relevant regulatory provisions, 19 C.F.R. § 351.414(f)(1)(i) and (f)(3), do not apply to the administrative review at issue.**

The question is whether these provisions, see supra pp.29–30, which by their terms apply

to investigations but do not mention administrative reviews, are applicable to the administrative

review in this case.  See 19 C.F.R. § 351.414(f).  The Federal Circuit's ruling in Apex II provides

this court with some guidance on the issue.  In Apex II, the Federal Circuit considered whether

Commerce was obligated to explain why it would not follow the Limiting Regulation in the Final

Results of the seventh administrative review of the antidumping duty order on Certain Frozen

Warmwater Shrimp from India.  Apex II, 862 F.3d at 1335–36; see Certain Frozen Warmwater

Shrimp from India, 78 Fed. Reg. 42,492 (Dep't Commerce July 16, 2013).  The court rejected

plaintiff respondent Apex's argument that Commerce, by conducting its reviews according to the

investigations statute, 19 U.S.C. § 1677f-1(d)(1), "has now essentially eliminated any meaningful

distinctions between its targeted dumping methodology in [antidumping] reviews and

investigations."  Id. at 1335.  The Federal Circuit reasoned that "Commerce did not imply that it

would assume all requirements and follow all regulations associated with investigations, merely

by adopting a single statutory scheme for reviews as well.  And Apex cites no authority that

Commerce, in doing so, bound itself to follow the Limiting Rule."  Id. at 1336.  The court also

observed that "the Limiting Rule, § 351.414(f), was created at a time when the A-T methodology was restricted for investigations but used as a matter of course for reviews." Id.   Finally, the Federal Circuit saw "little reason to extend the Limiting Rule's application to this case where Apex offer[ed] no compelling rationale for doing so and where Commerce's policies have clearly changed over time." Id.

Stanley argues that Apex II considers the applicability to administrative reviews of only 19 C.F.R. § 351.414(f)(2), and thus the Federal Circuit's conclusions do not address those subsections of § 351.414(f) -- specifically, (1)(i) and (3) -- that Stanley argues were contravened in this proceeding. Pl.'s Suppl. Br. at 6.   Stanley characterizes (f)(2) as "the Limiting Rule," a designation which does not incorporate the other subsections of (f).   Id.   Stanley argues that the Federal Circuit's definitive conclusion, that "the 'Limiting Rule' only applies to investigations, not administrative reviews," Apex II, 862 F.3d at 1336, therefore does not preclude Stanley's instant arguments regarding (f)(1)(i) and (3).   Pl.'s Suppl. Br. at 6.

Stanley also argues that there is a "compelling rationale" to apply (f)(1)(i) and (3) to the administrative review at issue here, in line with the Federal Circuit's notation that it "s[aw] little reason to extend the Limiting Rule's application to this case where Apex offers no compelling rationale for doing so and where Commerce's policies have changed over time." Apex II, 862 F.3d at 1336.   In essence, Stanley contends that the "compelling rationale" for applying (f)(3) to this case is found in Commerce's statement accompanying the promulgation of that subsection:

> It is the Department's view that normally any targeted dumping examination should begin with domestic interested parties. It is the domestic industry that possesses intimate knowledge of regional markets, types of customers, and the effect of specific time periods on pricing in the U.S. market in general. Without the assistance of the domestic industry, the Department would be unable to focus appropriately any analysis of targeted dumping. For example, the Department would not know what regions may be targeted for a

particular product, or what time periods are most significant and can
impact prices in the U.S. market.

Antidumping Duties; Countervailing Duties, Final Rule, 62 Fed. Reg. at 27,374.  Stanley argues

that applying the "standard and appropriate statistical techniques" provision in (f)(1) "ensures that

Commerce's analysis of price differences and patterns is reasonable, relevant, statistically valid,

and correctly calculated – the fundamental elements of a lawful determination."  Pl.'s Suppl. Br.

at 8.

The court finds that the provisions of 19 C.F.R. § 351.414(f) presented by Stanley do not

apply to administrative reviews.  It bears repeating that "Commerce did not imply that it would

assume all requirements and follow all regulations associated with investigations, merely by

adopting a single statutory scheme for reviews as well."  Apex II, 862 F.3d at 1336.  Stanley

presents no authority demonstrating that Commerce had assumed the obligation of applying 19

C.F.R. § 351.414(f) in administrative reviews.

Further, Stanley has not overcome the plain regulatory language indicating that its

proffered subsections apply to investigations.  See 19 C.F.R. §§ 351.414(f)(1) ("[Commerce] may

apply the [A-T] method . . . in an antidumping investigation if . . ."), (3) ("[Commerce] normally

will examine only targeted dumping described in an allegation, filed within the time indicated in

§ 351.301(d)(5)."), 351.301(d)(5) ("In an antidumping investigation . . . "); see Hudgens v.

McDonald, 823 F.3d 630, 638 (Fed. Cir. 2016) ("[A]n agency's interpretation of its own regulation

controls, unless the interpretation is 'plainly erroneous or inconsistent with the regulation.'"

(quoting Auer v. Robbins, 519 U.S. 452, 461 (1997))).

The court further finds unpersuasive Stanley's "compelling rationale" arguments, even if

applicable.  To the extent that the Federal Circuit created a "compelling rationale" standard to be

applied, Stanley, like the plaintiff in Apex II, has not offered a compelling rationale for extending

the Limiting Rule's application  "where Commerce's policies have clearly changed over time." Apex II, 862 F.3d at 1336.  Stanley's submitted rationales are essentially policy arguments lacking the weight of binding authority.  Pl.'s Suppl. Br. at 7–8.  They do not provide grounds for this court to rewrite Commerce's regulation, or to displace Commerce's application of that regulation according to its terms.  See Hudgens, 823 F.3d at 638 (quoting Auer, 519 U.S. at 461).

Accordingly, assuming the correctness of applying a "compelling rationale" standard, Stanley has offered no such rationale that would move this court to extend to administrative reviews the application of a regulation that by its terms, and under the Federal Circuit's construction, applies only to investigations.

## **CONCLUSION**

For the foregoing reasons, it is hereby

**ORDERED** that Stanley's motion for judgment on the agency record is denied; and it is further

**ORDERED** that Commerce's Final Results are sustained.

*/s/   Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: November 27, 2017
          New York, New York